IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-00331-PAB

HANAN D. ANGSTADT,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

      Defendant.
_____

**ORDER**
_____

      This matter is before the Court on plaintiff Hanan D. Angstadt's complaint [Docket No. 1], filed on February 8, 2011.  Plaintiff seeks review of the final decision of defendant Carolyn W. Colvin (the "Commissioner") denying plaintiff's claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-33 and 1381-83c.[1]  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g).

**I. BACKGROUND**

      On December 17, 2007, plaintiff applied for disability benefits under Title II and Title XVI of the Act.  R. at 8.  Plaintiff alleged that she had been disabled since April 2003.  *Id*.  After an initial administrative denial of her claim, plaintiff received a hearing before an Administrative Law Judge ("ALJ") on May 5, 2009.  *Id*.  On November 19, 2009, the ALJ issued a decision denying plaintiff's claim.  *Id*. at 31.

_____

[1] The Court has determined that it can resolve the issues presented in this matter without the need for oral argument.

The ALJ found that plaintiff had the severe impairments of "Visual Midline Shift Syndrome, attended with light triggered migraine headaches."  R. at 10.  The ALJ found that these impairments did not meet one of the regulations' listed impairments, R. at 25, and ruled that plaintiff had the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels, that does not require exposure to environmental temperature extremes or more than occasional use of computers."  R. at 26.  Based upon this RFC and in reliance on the testimony of a vocational expert ("VE"), the ALJ concluded that plaintiff is not disabled because, through the date last insured, "the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy."  R. at 31.

The Appeals Council denied plaintiff's request for review of this denial.  R. at 1. Consequently, the ALJ's decision is the final decision of the Commissioner.

## II.  ANALYSIS

### A.  Standard of Review

Review of the Commissioner's finding that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *See Angel v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003).  The district court may not reverse an ALJ simply because the court may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision.  *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is more than a mere scintilla and is such relevant

2

evidence as a reasonable mind might accept as adequate to support a conclusion."

*Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).   Moreover, "[e]vidence is not

substantial if it is overwhelmed by other evidence in the record or constitutes mere

conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).   The district

court will not "reweigh the evidence or retry the case," but must "meticulously examine

the record as a whole, including anything that may undercut or detract from the ALJ's

findings in order to determine if the substantiality test has been met."  *Flaherty*, 515

F.3d at 1070.   Nevertheless, "if the ALJ failed to apply the correct legal test, there is a

ground for reversal apart from a lack of substantial evidence."  *Thompson v. Sullivan*,

987 F.2d 1482, 1487 (10th Cir. 1993).

### B.  The Five-Step Evaluation Process

To qualify for disability benefits, a claimant must have a medically determinable

physical or mental impairment expected to result in death or last for a continuous period

of twelve months that prevents the claimant from performing any substantial gainful

work that exists in the national economy.  42 U.S.C. § 423(d)(1)-(2).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical
> or mental impairment or impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists
> in the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (2006).  The Commissioner has established a five-step

sequential evaluation process to determine whether a claimant is disabled.  20 C.F.R.

§ 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  The steps of the

evaluation are:

> (1) whether the claimant is currently working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets an impairment listed in appendix 1 of the relevant regulation; (4) whether the impairment precludes the claimant from doing his past relevant work; and (5) whether the impairment precludes the claimant from doing any work.

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (citing 20 C.F.R.

§ 404.1520(b)-(f)).  A finding that the claimant is disabled or not disabled at any point in

the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of*

*Health and Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

The claimant has the initial burden of establishing a case of disability.  However,

"[i]f the claimant is not considered disabled at step three, but has satisfied her burden of

establishing a prima facie case of disability under steps one, two, and four, the burden

shifts to the Commissioner to show the claimant has the residual functional capacity

(RFC) to perform other work in the national economy in view of her age, education, and

work experience."  *See Fischer-Ross v. Barnhart,* 431 F.3d 729, 731 (10th Cir. 2005);

*see also Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987).  While the claimant has the

initial burden of proving a disability, "the ALJ has a basic duty of inquiry, to inform

himself about facts relevant to his decision and to learn the claimant's own version of

those facts."  *Hill v. Sullivan,* 924 F.2d 972, 974 (10th Cir. 1991).

### C.  Medically Determinable Impairments

Plaintiff contends that the ALJ erred at step two of the analysis in failing to find

that plaintiff suffered from severe medically determinable cognitive and mental

impairments during the relevant time period–from April 2003, her alleged onset date,

4

through March 31, 2005, her date last insured.  Docket No. 21 at 15-17; *see* R. at 8, 10.

Defendant counters that the ALJ's step two determination was correct because

plaintiff's records predating the alleged onset of her disability do not establish an

impairment during the relevant time period and because there is no evidence that

plaintiff was unable to afford treatment for these alleged impairments.  Docket No. 22 at

14-15.

Plaintiff claims that pre-onset information confirms the existence of "the condition

and symptoms that existed between April 2003 and March 2005."  Docket No. 23 at 4.

Plaintiff does not explain the relevance of information after her date last insured, but it

is presumably noted for the same reason.  Plaintiff relies on the fact that she sought

treatment from psychiatrist Elliott Cohen in 1999, R. at 265; from clinical psychologist

Charles Franklin in 1999, R. at 265; from clinical psychologists Dennis Helffenstein and

Theresa Gisi in 2001, R. at 262, 269; from Dr. Anthony Ricci in 2002, who administered

psychological tests indicating that plaintiff suffered from anxiety, moderate depression,

and memory complications, R. at 292; and from Dr. Kenneth Allred, who found that

plaintiff suffered from "a moderate level of depression" in April 2009, R. at 762.  Docket

No. 21 at 16-17.  Plaintiff also cites a record indicating that dentist Gary Ellingson

recommended she undergo biofeedback treatment with Dr. Ricci, but that plaintiff's

insurance would not cover the service.  R. at 292.  Plaintiff further argues that the ALJ

cannot rely on plaintiff's failure to seek treatment for her mental and cognitive

impairments between 2002 and 2009 because this gap was due to her inability to afford

additional mental health treatment.  Docket No. 21 at 16-17.

At her initial appointment with Dr. Franklin in April 1999, plaintiff was diagnosed

with generalized anxiety disorder, dysthymic disorder, rule-out pain disorder, and rule-out post-traumatic stress disorder.  R. at 248.  Plaintiff references, but does not discuss, Dr. Helffenstein's description of her psychological treatment history:

> Her personal history is significant for being evaluated by a psychiatrist, Dr. Elliott Cohen, in the early part of 1999 related to the symptoms that she was experiencing at that time.  Dr. Cohen referred her to Charles Franklin, Ph.D., Licensed Clinical Psychologist.  She worked with Dr. Franklin for approximately one year and he provided both individual as well as some couple therapy to her and her husband.  She noted that it was his overall impression that the problems which she was experiencing were medically related and not psychogenic in nature.

R. at 265.  On January 24, 2002, Dr. Helffenstein and Dr. Gisi, who were treating plaintiff's post-traumatic anxiety and depression, noted that plaintiff "reported good success with her eye therapy.  She feels stronger now than since the [accident].  She is determined to manage her pain and other symptoms so she can go forward in her life." R. at 288.

A plaintiff seeking disability benefits must show that her inability to perform substantial gainful activity results from "anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques.  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings." 20 C.F.R. § 404.1508.  "Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception.  They must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1528(b).  An impairment is "severe" if it "significantly limit[s]" a claimant's

6

"physical or mental ability to do basic work activities," such as walking, standing, sitting, seeing, hearing, speaking, carrying out simple instructions, using judgment, responding appropriately to supervision or coping with changes in routine.  20 C.F.R. § 404.1521.

An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering" that the "individual may be unable to afford treatment and may not have access to free or low-cost medical services."  SSR 96-7p, 1996 WL 374186, at *7-8 (July 2, 1996).  However, the absence of evidence that a claimant was either denied medical care because of her inability to pay or that she sought to obtain low-cost medical treatment through alternative channels may undercut a claim that the failure to seek medical treatment was due to cost.  *Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir. 1992); *see also Branum v. Barnhart*, 385 F.3d 1268, 1274 (10th Cir. 2004) (noting that "plaintiff has not made any extensive attempts to obtain relief for her back pain, as the medical contacts regarding her back pain have been infrequent"); *Madron v. Astrue*, 311 F. App'x 170, 178-79 (10th Cir. 2009) ("Ms. Madron's claimed inability to pay for an MRI is consistent with her long history of struggling to pay her medical expenses. Ms. Madron has indicated that she is unable to afford the operation needed to repair her broken ankle.  She occasionally has had to go without her asthma medication because it is too expensive.  And she started going to Clinica Campesina when she could no longer afford private doctors.  On this record, Ms. Madron's failure to pay for an MRI is not substantial evidence of overstated pain.").

The ALJ noted that plaintiff saw Dr. Franklin from April 1999 through June 1999 and from April 2000 to May 2000, but found this insufficient to establish an impairment

lasting twelve or more months during that time period.  The ALJ further found that:

> The medical evidence of record contains no additional mental health treatment records during the period from the alleged disability onset date, through the date last insured, although the claimant testified that she also saw a counselor, Dr. Cohn [sic], in 1999.  Nevertheless, the medical evidence fails to establish that the claimant required mental health treatment for any continuous period of at least 12 months between February 1999 and March 31, 2005.  Additionally, the physical medicine treatment records do not document ongoing complaints of, or treatment for psychologically based symptoms during this period.

R. at 14.  The ALJ discussed the records of plaintiff's treatment with Drs. Helffenstein and Gisi from August 2001 through January 2002 and noted Dr. Gisi's statement that plaintiff reported "good success" with her driving anxiety.  R. at 16.  The ALJ discussed Dr. Ricci's finding that plaintiff suffered from "significant anxiety, moderate depression, and a number of incidental memory complications."  R. at 17.  The ALJ then stated that "[t]here are no indications in the medical evidence of record, that the claimant underwent any continuing mental health treatment for anxiety, depression, or 'memory complications.'"  *Id.*

Regarding the ALJ's step two determination, the evidence indicates that plaintiff's treatment in 2001 was largely successful and that plaintiff complained of mental impairments only sporadically after that point.  It does not establish a cognitive or mental impairment lasting for twelve or more months during the relevant time period.  Furthermore, although the record indicates that plaintiff's insurance would not cover bio-feedback treatment, it does not show that plaintiff was unable to obtain other mental health treatment or that she made any effort to seek low-cost treatment options.  Thus, the ALJ did not err in considering the lack of treatment for mental impairments between 2002 and 2009.  *See Murphy*, 953 F.2d at 386-87.

In sum, plaintiff has not identified a basis for reversing the ALJ's determination at step two.

### D.  Residual Functional Capacity

Plaintiff argues that the ALJ's assessment of her RFC is in error because the ALJ did not sufficiently take into account the limitations imposed by her migraines and improperly discounted the opinion of her treating physician, George Juetersonke. Docket No. 21 at 17-23.  Defendant counters that the ALJ's RFC determination was based on substantial evidence and that the ALJ provided specific and legitimate reasons for the weight accorded to Dr. Juetersonke's opinion.  Docket No. 22 at 15-20.

A brief review of plaintiff's relevant medical history places these arguments in context.  Dr. Juetersonke, plaintiff's primary care provider prior to and during the relevant time period, completed a Headaches Residual Functional Capacity Questionnaire in March 2003 in which he opined that plaintiff suffered from "severe" migraine headaches for several hours on a daily basis, characterized by "stabbing sharp intermittent pain," nausea, photosensitivity, visual disturbances, mental confusion, and an inability to concentrate.  R. at 756-57.  He opined that these headaches were triggered by bright lights, noise, and screens, and could be helped only by lying in a dark room, as medication was "relatively ineffective."  R. at 757-58. He opined that, because plaintiff was precluded from working while she had a headache, she would have to miss work several times per month and that her impairment had lasted or would last at least twelve months.  *Id*. at 759-60.  He concluded that plaintiff "cannot work."  R. at 759.

On April 17, 2003, Dr. Timothy Sandell, whom plaintiff was seeing for physical

therapy, noted that plaintiff was "doing well," that she was "stable," and that she was ready to be released from care.  R. at 404.

On May 15, 2003, plaintiff met with Dr. Archana Shrestha for an evaluation of a possible seizure disorder.  R. at 405.  Plaintiff reported an eleven-year history of headaches to Dr. Shrestha, with attendant symptoms of nausea, slurred speech, language difficulties, dizziness, blurred vision, and impaired coordination.  *Id*.  Plaintiff stated that her headaches tended to last for a few hours, that the frequency varied, that she had experienced two headaches in the past month, but that, "when she was working, these were occurring on a daily basis."  *Id*.  Plaintiff stated that she had undergone a brain MRI four years prior and that the results were normal.  *Id*.  She stated that gabapentin was "definitely helping to decrease the frequency of her headaches."  *Id*.

On June 24, 2003, Dr. William Herrera wrote a note on a prescription pad stating that plaintiff was "[d]isabled for her occupation (software engineer) for >4 yrs by severe migraine."  R. at 538.  There are no additional records from Dr. Herrera.

On April 4, 2008, state agency psychiatrist George Coffee completed a Psychiatric Review Technique form for plaintiff and found that she met the listing for Affective Disorders.  R. at 476; *see* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (Listing of Impairments), § 12.04.  He noted that "[m]ental status exams are normal" during the relevant time period and that plaintiff has "[m]ultiple complaints not corroborated by treating doctors."  R. at 488.  He concluded that plaintiff's "[c]ondition was programatically non severe prior to 3/31/05."  R. at 490.

On March 7, 2009, Dr. Syed S. Mustafa performed a consultative examination of

10

plaintiff and diagnosed her with a history of basilar migraines and post-concussive syndrome, expected to impose limitations for over twelve continuous months.  R. at 500.  Dr. Mustafa found that plaintiff would not be limited in her ability to sit, stand, carry, remain in certain postures, or engage in fine or gross manipulation, but that she should not work in an excessively noisy environment to avoid triggering a migraine.  R. at 501.

On April 30, 2009, treating physician Laura Strom completed a Headaches Residual Functional Capacity Questionnaire on behalf of plaintiff in which she found that plaintiff suffered from chronic and basilar migraines on a daily basis, accompanied by ataxia and paresthesia.  R. at 770-71.  She opined that plaintiff's headaches were triggered by bright lights, stress, exercise, and computer screens.  R. at 771. She opined that plaintiff would need to take unscheduled breaks from work more than twice per week and would be absent more than four times per month.  R. at 773-74.

Dr. Strom also completed a Psychiatric Review Technique form in which she opined that plaintiff had met the listing for a central nervous system vascular accident since April 15, 2003.  R. at 779 ("Pt demonstrated these problems by history as early as 4/2003–by report she had similar symptoms previous to that time but was not under our care."); *see* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (Listing of Impairments), § 11.04(B).

In reviewing plaintiff's medical history, the ALJ stated several times that plaintiff's reports of her symptoms were inconsistent over time.  R. at 18 ("Dr. Goldbaum was somewhat concerned about the discrepancy between the documentation available in

11

Dr. Tyler's records and the history presented to him by the claimant.[2]  He noted that a

substantial number of her presenting complaints were presented as significant

exacerbations of pre-existing impairments and disability.  Dr. Goldbaum observed that

none of these issues were noted in any of Dr. Tyler's reports, which would indicate that

either Dr. Tyler failed to document them or that the claimant failed to mention them.");

19 ("The undersigned notes in passing that the claimant's reporting of her

symptomatology to the treating sources was notably inconsistent through February 22,

2002."); and 21 ("The undersigned again notes the inconsistency in the claimant's

reporting of her symptomatology to her treating and examining sources.  Specifically,

she presented an 11-year history of headaches, with a detailed description of numerous

attendant symptoms . . . . As summarized above, the prior medical evidence does not

document such a symptom complex, either acute or chronic.").

       After considering the medical evidence through December 2005, eight months

after plaintiff's date last insured, the ALJ concluded that:

> [T]he medical evidence since February 22, 2002, and through December 1,
> 2005, documents routine medical care for acute medical conditions.  No new
> medically determinable impairment is established during this period.  Indeed,
> the impairment of migraine headaches, the impairment upon which Mr.
> Sokolow has based his case, was considered to be well controlled with
> medication.  Moreover, there appears to be [sic] have been no medical
> treatment between December 1, 2005, approximately eight months after the
> date last insured, and October 1, 2007, almost two years later.

R. at 23.  The ALJ's determination that, during this time period, plaintiff had the RFC to

perform work at all exertional levels, relied on in particular (1) plaintiff's December 1,

_____

[2]Dr. Mitchell Goldbaum met with plaintiff on February 22, 2002 and documented
an extensive medical history, in addition to reviewing her records; he examined plaintiff
on February 25, 2002.  R. at 294-301.

2005 statement that her headaches were "well controlled" with gabapentin, R. at 27 (citing R. at 436); (2) the lack of evidence documenting ongoing balance or coordination problems prior to March 31, 2005, R. at 28; and (3) plaintiff's reported activities of daily living, including getting her daughter ready for school, doing light housework, and taking courses in nursing from 2004 through 2007.  *Id*.

The ALJ's RFC determination was also based on her conclusion that the medical opinion evidence did not support a finding of disability prior to the date last insured.  R. at 28-30.  The ALJ accorded little weight to Dr. Juetersonke's opinion because she found it was not supported by his treatment notes and was inconsistent with other substantial evidence in the record.  R. at 28.  She gave little or no weight to the opinion of Dr. William Herrera because she found it was not supported by objective medical signs and findings.  R. at 21, 28.  She gave no weight to Dr. Strom's opinions because she found they were not consistent with the medical evidence prior to October 2007 and because there is no indication that Dr. Strom was involved in plaintiff's treatment during the relevant time period.  R. at 29-30.  She found that Dr. Strom's opinion that plaintiff's migraine-related limitations had been present since 2003 was based on plaintiff's subjective reports and not on medical evidence.  *Id.*

The ALJ credited the following statement from Dr. Sandell's April 17, 2003 treatment notes: "[Plaintiff] is doing well.  I feel she is stable at this point.  I don't feel there is any further diagnostic studies or change in treatment to pursue.  Therefore, I am going to release her from my care and have her follow-up with me only as needed."  R. at 30 (citing R. at 404).  She also accorded significant weight to Dr. Coffee's opinion because he is familiar with the Social Security requirements and because she found his

opinion to be supported by objective findings.  R. at 28.

In addition to reviewing the medical record prior to plaintiff's date last insured, the ALJ discussed the record from October 2007 through April 2009.  R. at 23-25.  She concluded that, "[w]hile the medical evidence, beginning more than two years after the date last insured, also establishes basilar migraines and depression, as medically determinable impairments, these impairments were not established during the relevant period and, therefore, are not material to this decision."  R. at 25.

### 1.  Treating Source Opinion

Plaintiff argues that the ALJ erred in improperly discounting the opinion of her treating physician, Dr. Juetersonke.  Docket No. 21 at 22-23.  Defendant counters that the ALJ's treatment of Dr. Juetersonke's opinion was proper because the ALJ provided specific, legitimate reasons for discounting it, namely, the finding that it was not well supported and was contradicted by substantial evidence in the record.  Docket No. 22 at 19-20.

The ALJ noted that Dr. Juetersonke's medical records from 1999 through 2004 do not document plaintiff's subjective complaints or any objective clinical findings related to her migraines and thus found that Dr. Juetersonke's opinion of plaintiff's functional limitations is not well supported by objective medical evidence.  R. at 22. She found Dr. Juetersonke's 2003 RFC Questionnaire to be inconsistent with Dr. Sandell's notes, insofar as Dr. Sandell stated that plaintiff was stable and doing well and did not document complaints of severe headaches.  R. at 20.  The ALJ found that the 2003 RFC Questionnaire was undermined by the fact that plaintiff sought medical care several times between June 2004 and December 2005 for congestion, suspected

14

diabetes, neck pain, and diarrhea, without mentioning or complaining of headaches

until she sought a refill for her gabapentin prescription in December 2005 so she could

continue her nursing studies.  R. at 22-23.  The ALJ concluded that "Dr. Juetersonke's

opinion is not consistent with the other substantial evidence" and "is on an issue that is

reserved to the Commissioner" and thus did not give the opinion significant weight.  R.

at 28.

> The Social Security Regulations provide that:
>
> 2.  Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.
>
> 3.  Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.
>
> 4.  Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.
>
> 5.  The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.
>
> 6.  If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.

SSR 96-2P, 1996 WL 374188, at *1 (July 2, 1996).  If a treating source's opinion does

not meet the above criteria, the ALJ must apply the factors listed in 20 C.F.R.

§ 404.1527(c)(2)-(6) to determine how much weight to accord it.  In addition, the ALJ

must set forth "specific reasons for the weight given to the treating source's medical

opinion."  1996 WL 374188 at *5.  The ultimate determination of disability is an issue

reserved to the Commissioner and thus a "statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean" that the ALJ will make a finding of disability.  20 C.F.R. § 404.1527(d)(1).

The ALJ provided specific reasons for discounting Dr. Juetersonke's opinion regarding plaintiff's migraines.  First, she noted that the opinion is not supported by Dr. Juetersonke's treatment notes.  *See generally* R. at 411-33.  These notes do not discuss or refer to plaintiff's migraines, and instead contain only Dr. Juetersonke's referrals to other physicians; a list of plaintiff's treatment providers, prepared by plaintiff, *see* Docket No. 21 at 19, n.9; the results from various blood tests run between 1999 and 2004; the result from a series of spine X-rays; and several body composition reports from 2000.  *See* R. at 411-33.  Thus, the ALJ did not err in finding that Dr. Juetersonke's opinion is not supported by his objective medical findings.  Moreover, the Tenth Circuit has rejected the argument that a treating physician's opinion rests upon other medical evidence in the record where the physician's notes do not contain any reference to tests or examinations performed by other healthcare providers.  *See Jelitto v. Astrue*, 509 F. App'x 712, 713 (10th Cir. 2013) ("Ms. Jelitto replies by arguing that Dr. Lundsberg reviewed and relied on work performed by two other doctors, doctors who conducted a number of tests on her back . . . . The difficulty is, Dr. Lundsberg's notes only once reference a CT scan and make no mention of the other tests.  [citation]  The record thus simply does not support Ms. Jelitto's claim that he based his opinion on the tests other doctors performed.").  Accordingly, the ALJ did not err in denying Dr. Juetersonke's opinion controlling weight.

Furthermore, the ALJ noted inconsistencies between Dr. Juetersonke's opinion

and other evidence in the record, such as Dr. Sandell's statement that plaintiff's condition was stable; Dr. Shrestha's statement that plaintiff felt gabapentin was "definitely helping to decrease the frequency of her headaches"; and the absence of migraine complaints in 2004 and 2005.  R. at 20-21, 23 (citing R. at 404-05).  Both the consistency of Dr. Juetersonke's opinion with other substantial evidence in the record and the extent to which he presented evidence in support of that opinion are relevant factors under 20 C.F.R. §§ 404.1527(c)(3) and (4) that the ALJ properly considered in explaining the weight she accorded the opinion.  *See* R. at 28.

Thus, there is no basis for finding that the ALJ lacked substantial evidence for her determination or that she misapplied the law.  *See Thompson*, 987 F.2d at 1487.

### 2. Nonexertional Limitations

Plaintiff raises several arguments in support of her contention that the ALJ should have included additional limitations in her RFC determination to reflect the likelihood that plaintiff will need to take unscheduled breaks and days off from work due to her migraines.  Docket No. 21 at 19 ("we have an impairment that imposes limitations on Ms. Angstadt's ability to regularly attend work and/or stay there throughout a normal 8 hour work day").

First, plaintiff argues that the ALJ's RFC determination was improperly based on the fact that plaintiff's physicians have not identified a precise cause for her migraines. Docket No. 21 at 18.  This argument is not supported by the text of the ALJ's decision. *See generally* R. at 10-30.  Although the ALJ discussed the October 2007 notes from Dr. Jeffrey Bennett indicating that he could not determine the cause of plaintiff's migraines, there is no indication that this finding provided the basis for the ALJ's

17

determination.  *See* R. at 23, 27-28.

Next, plaintiff argues that the ALJ erred in considering inconsistencies between

plaintiff's medical complaints over time because:

> Ms. Angstadt has seen many doctors and given her history on many
> occasions; it seems quite possible and inevitable, that she did not state her
> symptoms and limitations in exactly the same way each time.  Furthermore,
> there is no way of knowing if each and every provider recorded her
> statements verbatim.  None of the providers that she has seen disagree or
> dispute the fact that she has migraine headaches.

Docket No. 21 at 18.  The Social Security Regulations provide that "[o]ne strong

indication of the credibility of an individual's statements is their consistency, both

internally and with other information in the case record."  SSR 96-7p, 1996 WL 374186,

at *5 (July 2, 1996).  Thus, the ALJ "must consider" the "consistency of the individual's

own statements" and "must compare statements made by the individual in connection

with his or her claim for disability benefits with statements he or she made under other

circumstances."  *Id*.  The regulations highlight "statements made to treating or

examining medical sources" as being "[e]specially important" in this regard.  *Id*.  While it

is possible that, as plaintiff suggests, the inconsistencies in her statements to treating

physicians regarding the symptoms and intensity of her migraines were the result of her

physicians' recording errors, the ALJ was entitled to consider these inconsistencies in

arriving at an RFC determination.  *See id*; *see also Harris v. Astrue*, 496 F. App'x 816,

821 (10th Cir. 2012) ("It was proper for the ALJ to consider inconsistency between Ms.

Harris's hearing testimony and her filings when evaluating her credibility.").

Finally, plaintiff argues that the ALJ improperly discounted medical records

predating her alleged onset of disability, even though "[i]t is the same condition; one

that was extensively worked up during the earlier time frame and remained consistent as far as symptoms and recommended treatments throughout the entire period of time." Docket No. 23 at 4.  In support of this argument, plaintiff cites the similarities between her description of her symptoms to Dr. Shrestha in April 2003 and to the numerous physicians she saw prior to that date, as well as the Residual Functional Capacity Questionnaire completed by Dr. Juetersonke in March 2003.[3]  R. at 757.  Plaintiff also cites Dr. Shrestha's notes indicating that plaintiff was experiencing several migraines per month, despite her efforts to avoid triggers, R. at 407, and the 2009 Residual Functional Capacity Questionnaire in which Dr. Strom opined that plaintiff would need to take unscheduled breaks during an eight-hour workday at least twice per week.  R. at 773-74.

Defendant responds that, during the relevant time period, plaintiff received little medical treatment, did not complain that her migraines were disabling, and reported that her symptoms were well controlled on medication.  Docket No. 22 at 15.

---

[3] *Compare* R. at 405 (Dr. Shrestha's notes documenting complaints of stabbing headache pain, nausea, slurred speech, dizziness, impaired coordination, slowed motor responses, blurred vision, and language impairment) *with* R. at 183 (physician assistant Michelle Morrison's March 1999 notes documenting complaints of migraines accompanied by photophobia and nausea), R. at 191 (Dr. Roberts' June 1999 notes finding that plaintiff's "headaches are quite characteristically migraine"), R. at 216 (September 1999 letter from Dr. James Georgis documenting complaints of headaches, photophobia, balance problems, dizziness, crowd phobia, and impaired coordination), R. at 210 (January 2000 letter from Dr. Barbara Esses documenting complaints of dizziness); R. at 266 (Dr. Helffenstein's August 2001 notes documenting complaints of migraines two to three times per week, along with dizziness, decreased coordination, balance problems, and phonophobia), R. at 286 (Dr. John Hills' January 2002 notes documenting complaints of migraines), *and* R. at 297-98 (Dr. Goldbaum's February 2002 notes documenting "[h]ypersensitivity to light which triggers a headache," headaches in the left occipital area, and ongoing problems with vision).

Defendant further argues that the evidence plaintiff cites subsequent to her date last insured cannot establish that plaintiff was disabled during the relevant time period. Docket No. 22 at 16.

> [E]vidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to have been present and to have imposed limitations as of the earning requirement date.

*Baca v. Dep't of Health & Human Servs.*, 5 F.3d 476, 479 (10th Cir. 1993) (remanding in part because ALJ ignored evidence from before and after plaintiff's date last insured in finding there was no probative medical evidence documenting disability during the relevant time period) (quoting *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 42 (2d Cir. 1972)).  In considering these arguments, the Court is mindful that it may not "displace the agency's choice between two fairly conflicting views, even [if] the court would justifiably have made a difference choice had the matter been before it de novo." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (internal citations omitted).

As the ALJ acknowledged, the medical record establishes that plaintiff has sought treatment for migraine headaches since at least 1999.  *See* R. at 11 (citing R. at 183).  However, plaintiff's burden was to demonstrate that, before her date last insured, her impairments were sufficiently severe to prevent her from "engag[ing] in any substantial gainful activity . . . for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In contrast to *Baca*, the ALJ here did not find that plaintiff failed entirely to submit probative medical evidence of disability, but rather found the evidence submitted insufficient to establish disability prior to the date last insured.  *Compare* R. at

23 ("there appears to be [sic] have been no medical treatment between December 1, 2005, approximately eight months after the date last insured, and October 1, 2007, almost two years later") *with Baca*, 5 F.3d at 479 ("the ALJ's conclusion that Mr. Baca failed to submit 'any' probative medical evidence documenting his condition before December 31, 1976, is unsupported by substantial evidence").  The ALJ found that the evidence of plaintiff's disability was outweighed by other evidence in the record, including her daily activities during the relevant time period; her statement that her migraines were controlled on gabapentin through 2005; and the absence of migraine complaints from 2004 through 2007.  The evidence cited by the ALJ constitutes substantial evidence in support of her RFC determination.  Regardless of whether the Court would reach the same determination on de novo review, it may not reweigh the evidence to arrive at a different conclusion on appeal.  *See Oldham*, 509 F.3d at 1258.

## III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the decision of the Commissioner that plaintiff was not disabled is AFFIRMED.

DATED September 20, 2013.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge